Robert C. Moest, Of Counsel, SBN 62166
**THE BROWN LAW FIRM, P.C.**
2530 Wilshire Boulevard, Second Floor
Santa Monica, CA 90403
Telephone: (310) 915-6628
Email: rmoest@gmail.com

*Counsel for Plaintiff*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| ERIC MARCUS, derivatively on behalf of GROCERY OUTLET HOLDING CORP.,<br><br>Plaintiff,<br><br>v.<br><br>JASON POTTER, CHRISTOPHER M. MILLER, JOHN E. BACHMAN, MARY KAY HABEN, CAREY F. JAROS, MICHAEL K. KOBAYASHI, ERIC J. LINDBERG, JR. LAWRENCE P. MOLLOY, GAIL MOODY-BYRD, ERIK D. RAGATZ, and JEFFREY R. YORK,<br><br>Defendants,<br><br>and<br><br>GROCERY HOLDING CORP.,<br><br>Nominal Defendant. | Case No.:<br><br>**DEMAND FOR JURY TRIAL**<br><br>**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** |

## INTRODUCTION

Plaintiff Eric Marcus ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of nominal defendant Grocery Outlet Holding Corp. ("Grocery Outlet" or the "Company"), files this Verified Shareholder Derivative Complaint against defendants Jason Potter ("Potter"), Christopher M. Miller ("Miller"), John E. Bachman ("Bachman"), Mary Kay Haben ("Haben"), Carey F. Jaros ("Jaros"), Michael K. Kobayashi ("Kobayashi"), Eric J. Lindberg, Jr. ("Lindberg"), Lawrence P. Molloy ("Molloy"), Gail Moody-Byrd ("Moody-Byrd"), Erik D. Ragatz ("Ragatz"), and Jeffrey R. York ("York") (collectively, the "Individual Defendants," and together with Grocery Outlet, "Defendants") for breaches of their fiduciary duties as directors and/or officers of Grocery Outlet, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and against Defendants Potter and Miller for contribution under Sections 10(b) and 21D of the Securities Exchange Act of 1934 (the "Exchange Act"). As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Grocery Outlet, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a shareholder derivative action that seeks to remedy wrongdoing committed by the Individual Defendants from August 5, 2025 to March 4, 2026, both dates inclusive (the "Relevant Period").

2. Grocery Outlet is a Delaware corporation headquartered in Emeryville, California, chiefly engaged in the retail consumable and produce industry. As such, the Company sells a number of high-quality, name-brand products predominantly through its network of independently owned stores.

3. Among the Company's purported strengths is its ability to provide high-quality consumable products at significantly discounted prices as compared to its industry competitors. The Company cites its long-standing supplier relationships as the chief reason it can offer its products at such price ranges.

4. Notably, in the fourth quarter of the 2024 Fiscal Year,[1] the Company initiated a plan to restructure its business operations, which was substantially completed by the end of the second quarter of the 2025 Fiscal Year (the "Restructuring Plan"). The Company's stated reasons for conducting the Restructuring Plan as, *inter alia*, improving the Company's long-term financial prospects.

5. Throughout the Relevant Period, the Individual Defendants repeatedly emphasized the Company's guidance for the 2025 Fiscal Year. As such, the Individual Defendants consistently and explicitly underlined the Company's ability to meet its expected financial goals for the 2025 Fiscal Year through, *inter alia*, its expansion into new stores and the implementation of the Restructuring Plan.

6. However, the Individual Defendants failed to disclose the true nature of the Company's plans for expansion, the success of the Restructuring Plan, and its overall ability to meet its expected financial goals for the 2025 Fiscal Year. More specifically, the Individual Defendants failed to disclose the extent to which the Company could successfully expand into new stores and implement the Restructuring Plan.

---

[1] Grocery Outlet's fiscal year does not mirror the calendar year, but instead operates on a 52/53 week period that ends on the Saturday closest to December 31 each year.
For the period between December 31, 2023 and December 28, 2024, the "2024 Fiscal Year."
For the period between December 29, 2024 and January 3, 2026, the "2025 Fiscal Year."
For the period between January 4, 2026 and January 2, 2027, the "2026 Fiscal Year."

7. For example, on August 5, 2025, the first day of the Relevant Period, the Company issued a press release to announce its financial results for the second quarter of the 2025 Fiscal Year (the "Q2 FY 2025 Press Release"). The Q2 FY 2025 Press Release stated, *inter alia*, that "[n]et sales increased 4.5% to $1.18 billion during the second quarter," which was allegedly due, in substantial part, to the addition of "***new store sales***,"[2] namely the commencement of "11 new stores" in the second quarter of the 2025 Fiscal Year."

8. The Q2 FY 2025 Press Release also discussed the Restructuring Plan and noted that the plan purported to, *inter alia*, "optimize the footprint of new store growth and lower the cost base" was "substantially completed in the second quarter of fiscal 2025."

9. The truth fully emerged on March 4, 2026, when the Company issued a press release to announce its financial results for the fourth quarter and full 2025 Fiscal Year (the "Q4 FY 2025 Press Release"). The Q4 FY 2025 Press Release quoted Defendant Potter as stating "[w]e made progress on our strategic priorities in 2025; however, our fourth-quarter results made clear that we have more work to do, and we're moving quickly[.]"

10. That same day, the Company hosted an earnings call to discuss its financial results for the fourth quarter and full 2025 Fiscal Year with investors and analysts (the "Q4 FY 2025 Earnings Call"). During the Q4 FY 2025 Earnings Call, Defendant Potter stated that the Company had "made the difficult decision to close 36 locations" and explained that "it's clear now that we expanded too quickly, and these closures are a direct correction."

11. On this news, the price per share of the Company's common stock fell roughly $2.45, or approximately 27.9%, from a price per share of $8.79 at the close of trading on March 4, 2026 to close at approximately $6.34 per share on March 5, 2026.

12. During the Relevant Period, the Individual Defendants, in breach of their fiduciary duties owed to Grocery Outlet, willfully or recklessly made and/or caused the

[2] Unless otherwise stated, all emphasis is added.

Company to make false and misleading statements. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose, *inter alia*, that: (1) the Restructuring Plan would require additional store closures and asset write-downs in order to achieve operational goals; (2) the Company's asserted financial growth was due to its rapid expansion into new stores; (3) the Company's expansion into new stores was unsustainable; (4) as a result of the foregoing, the Company was unable to achieve its previously issued financial guidance; and (5) the Company failed to maintain internal controls. As a result of the foregoing, the Individual Defendants caused the Company's public statements to be materially false and misleading at all relevant times.

13. The Individual Defendants failed to correct and/or caused the Company to fail to correct these false and misleading statements and omissions of material fact, rendering them personally liable to the Company for breaching their fiduciary duties.

14. Additionally, in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain adequate internal controls.

15. The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

16. In light of the Individual Defendants' misconduct—which has subjected the Company, its President and Chief Executive Officer ("CEO"), and its Executive Vice President ("EVP") and Chief Financial Officer ("CFO") to a federal securities fraud class action pending in the United States District Court for the Northern District of California (the "Securities Class Action"), which has further subjected the Company to the need to undertake internal investigations, the need to implement adequate internal controls, losses from the waste of corporate assets, and losses due to the unjust enrichment of the Individual Defendants who were improperly overcompensated by the Company and/or who benefitted from the wrongdoing alleged herein—the Company will have to expend many millions of dollars.

17. The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

18. In light of the breaches of fiduciary duty engaged in by the Individual Defendants, the majority of whom are the Company's current directors, of the collective engagement in fraud and misconduct by the Company's directors, of the substantial likelihood of the directors' liability in this derivative action and Defendants Potter and Miller's liability in the Securities Class Action, their being beholden to each other, their longstanding business and personal relationships with each other, and of their not being disinterested or independent directors, a majority of the Board cannot consider a demand to commence litigation against themselves and the other Individual Defendants on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

19. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 10(b) of the Exchange Act (15 U.S.C. §§ 78j(b)) and Section 21D of the Exchange Act (15 U.S.C. § 78u-4(f)). Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

20. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

21. This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

22. Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

## PARTIES

### Plaintiff

23. Plaintiff is a current shareholder of Grocery Outlet. Plaintiff has continuously held Grocery Outlet common stock since first purchasing shares on January 9, 2023.

**Nominal Defendant Grocery Outlet**

24. Grocery Outlet is a Delaware corporation with principal executive offices at 5650 Hollis Street, Emeryville, California 94608. Grocery Outlet's common stock trades on the Nasdaq Global Select Market ("Nasdaq") under the ticker symbol "GO."

**Defendant Potter**

25. Defendant Potter has served as the Company's President, CEO, and as a Company director since February 2025.

26. The Schedule 14A the Company filed with the SEC on April 17, 2025 (the "2025 Proxy Statement") stated the following about Defendant Potter, in relevant part:

> Since Feb. 2025, [Defendant Potter] served as President and Chief Executive Officer at Grocery Outlet. From Mar. 2020 to Jan 2025, [Defendant Potter] served as Chief Executive Officer and director at The Fresh Market, Inc., a specialty grocery retailer of fresh, gourmet food and prepared meals. From 1990 to June 2018, [Defendant Potter] served in successively senior positions at Sobeys Inc., a Canadian food and drug retailer and wholly owned subsidiary of The Empire Company Limited, including most recently as Executive Vice President of Operations (May 2017 to June 2018). Prior to that, he served as President of Sobeys West, President of Sobeys Atlantic and President of Multi-Format Operations.
>
> * * *
>
> ***Skills and Qualifications Relevant to Service on our Board***
>
> • More than 30 years of grocery retail experience and a merchant at heart, with a track record of growing and scaling grocery businesses of significant complexity to drive earnings growth and shareholder value. Most recently, at The Fresh Market, he led the successful transformation of the business to strong earnings growth, as well as driving an award-winning customer experience that led to its selection as USA Today's Readers' Choice "Best Supermarket in America" in 2021, 2022 and 2023. At Sobeys, one of the largest food retailers in North America, he oversaw store operations for

approximately 1,500 stores under several banners with more than $12 billion in revenues.

• Strong executive leadership experience, with more than 17 years of profit and loss leadership of The Fresh Market and numerous brands at Sobeys. Has led numerous transformational strategic projects for turnaround, growth and mature brands, and has strong financial expertise. Initiated key innovations, including e-commerce and private label development opportunities.

• Particular expertise in large-scale operations, complex supply chain and logistics, marketing, merchandising and strategy. Spent early career learning the retail food business through numerous jobs of increasing responsibility, including developing significant expertise in managing stores and distribution centers, real estate site selection as well as merchandising and marketing.

• As President and CEO, he is our operational and strategic day-to-day leader, and his vision, values and hands-on communication style aligns with the Company's goals and culture. Understands how to lead a customer-centric business model that emphasizes the store experience and customer loyalty.

• His prior experience as a combined CEO and a director of a private food and drug retailer provides him with relevant governance, risk management and strategic oversight expertise, as well as experience serving in dual capacities as an executive and director.

• Depth of experience with a franchise operating model at Sobeys, which has many similarities to Grocery Outlet's independent operator model.

(Emphasis in original).

**<u>Defendant Miller</u>**

27. Defendant Miller has served as the Company's EVP and CFO since January 6, 2025.

28. The 2025 Proxy Statement stated the following about Defendant Miller:

**Mr. Miller** previously served as Chief Financial Officer at Shamrock Foods Company, the largest family-held food service distributor in the western United States, since January 2023. From January 2007 to June 2022, he held several roles of increasing responsibility at Core-Mark Holding Co., a leading

> marketer of fresh food and broad-line supply solutions to the convenience retail industry in North America, including most recently as Core-Mark's Chief Financial Officer from January 2016 to June 2022. Prior to Core-Mark, he held various financial and accounting roles since 1983, including at Cost Plus World Market, formerly known as Cost Plus Inc. (2002 to 2006), Echo Outsourcing (2000 to 2002) and Levi Strauss & Co. (1996 to 2000).

(Emphasis in original).

**<u>Defendant Bachman</u>**

29. Defendant Bachman has served as a Company director since November 2019. Defendant Bachman currently serves as the Chair of the Audit and Risk Committee and as a member of the Compensation Committee.

30. The 2025 Proxy Statement stated the following about Defendant Bachman, in relevant part:

> Since 2016, [Defendant Bachman] has been an outside director for various public companies since his retirement. [From] 1978 to 2015, [Defendant Bachman served as a] former Certified Public Accountant at the global accounting firm, PricewaterhouseCoopers LLP, most recently as a partner (1989 to 2015). At PwC, [Defendant] Bachman served for six years (2007 to 2013) as the Operations Leader of the firm's U.S. Assurance Practice with full operational and financial responsibility for this $4 billion line of business, which included the firm's audit and risk management practices. Prior to this role, [Defendant] Bachman served for three years as the firm's U.S. Strategy Leader (2004 to 2007) where he was responsible for strategic planning across business units, geographies and industries. [Defendant] Bachman also served as an audit partner for over 25 years for companies in the industrial manufacturing, financial services, publishing, healthcare and other industries.
>
> * * *
>
> ***Skills and Qualifications Relevant to Service on our Board***
>
> • Extensive financial and accounting expertise, as well as business strategy, internal controls, financial reporting and enterprise risk oversight experience, from serving as a partner (as a former Certified Public Accountant) and in leadership roles for one of the world's largest accounting firms. In addition, he has served as Chair of our Audit Committee since Nov. 2019, as well as

the Audit Committee and Finance Committee of numerous other public companies in recent years. He has been determined by our Board to be an audit committee financial expert.

• Possesses public company director experience through his substantial board and board committee service in recent years for companies in a variety of industries, including an omnichannel retailer.

• Through many years of senior leadership at PwC, he has deep experience in operations, finance, risk management and strategic planning of a large, complex organization.

• Has retail experience through his lengthy board and board committee service to The Children's Place.

(Emphasis in original).

**Defendant Haben**

31. Defendant Haben has served as a Company director since November 2019. Defendant Haben currently serves as the Chair of the Nominating and Corporate Governance Committee and as a member of the Compensation Committee.

32. The 2025 Proxy Statement stated the following about Defendant Haben, in relevant part:

Since 2011, she has been an outside director for various public companies since her retirement. [From] Apr. 2007 to Feb. 2011, she held senior positions with Wm. Wrigley Jr. Company, a confectionery company, including President, North America (Oct. 2008 to Feb. 2011) and Group Vice President and Managing Director, North America (Apr. 2007 to Oct. 2008). Wrigley was public until October 2008, following which it became a subsidiary of Mars, Incorporated. Prior, she led several multi-billion divisions during her 27-year career with Kraft Foods, Inc., a grocery manufacturing and processing conglomerate, including Senior Vice President, Open Innovation (2006 to 2007), Senior Vice President, Global Snack Sector (2004 to 2006), and Group Vice President, Kraft Foods and President, Cheese, Enhancers and Meals (2001 to 2004).

* * *

***Skills and Qualifications Relevant to Service on our Board***

• Possesses substantial M&A, operating, digital, marketing, and brand management and development experience from long-term senior executive roles for consumer-packaged goods/food companies, including a strong track record in delivering value to shareholders and consumers through brand building, developing new products, innovation and implementation of business strategies in various markets and media platforms. Has deep knowledge of and ability to analyze the overall consumer-packaged goods industry, evolving market dynamics and consumers' relationships with brands. Executive experience also included numerous years of direct reports in sales, R&D and supply chain.

• Long-tenured current board member of two public companies, and a former long-term board member of a third public company. Significant oversight expertise in governance, compensation, finance, digital transformations and AI, digital and social marketing, supply chain strategy, ESG and enterprise risk management (including cybersecurity risks) from serving on public company boards, including numerous leadership and board committee roles, since her retirement in 2011. Experience includes two significant directorships with consumer-packaged goods/food companies.

• The breadth of experience and expertise leading boards and board committees, as well as serving in executive management roles, enable her to provide critical insights in overseeing and partnering with management.

(Emphasis in original).

**<u>Defendant Jaros</u>**

33. Defendant Jaros has served as a Company director since September 2020. Defendant Jaros currently serves as the Chair of the Compensation Committee.

34. The 2025 Proxy Statement stated the following about Defendant Jaros, in relevant part:

Since Oct. 2014, she has served in various executive positions at GOJO Industries, Inc., a global manufacturer of hand hygiene and surface disinfecting products and the maker of PURELL® brand Hand Sanitizer, including as President and Chief Executive Officer (since Jan. 2020), Chief Operating Officer (July 2018 to Jan. 2020), Chief Strategy Officer (May 2016

to July 2018), and a member of the Board of Directors of GOJO (since Feb. 2019). She also served as President of the private family office for GOJO's owners, Walnut Ridge Strategic Management Company, and was a member of GOJO's Board of Directors, and a Board Director for several other portfolio companies, while in that role (Oct. 2014 to Apr. 2016). From Apr. 2011 to Oct. 2014, she was employed at Dealer Tire, a tire and parts distributor for automotive OEMs and Dealers, as Vice President, OEM Programs (Feb. 2014 to Oct. 2014) and Vice President, Strategy, Business Development and Finance (Apr. 2011 to Feb. 2014). [From] June 2000 to Apr. 2011, she served in various roles at Bain and Company, a management consulting firm, including Senior Manager where she led consulting projects in retail and consumer products.

* * *

***Skills and Qualifications Relevant to Service on our Board***

• Possesses substantial executive management expertise on a broad range of management topics, including developing corporate strategy, recruiting and developing a senior executive team, assessing emerging industry trends as well as optimizing business operations.

• Developed extensive knowledge as a global consumer and industrial products leader throughout her career. At GOJO, the PURELL omnichannel and consumer business directly reports to her, including sales to all U.S. retailers and through e-commerce. At Bain, she spent more than 10 years primarily advising retail, consumer products and industrial sectors, including numerous public and private companies involved in food manufacturing and production.

• Oversees direct reports leading brand and consumer marketing since 2016 at GOJO, including responsibility for the marketing organization and leadership of brand strategy matters.

• Led a massive supply chain systems redesign following the COVID pandemic, including facilities, systems and equipment, to drive high-growth by more than doubling global production in a short time across North America and Europe. Redesign and scaling the business for significantly higher demand included overseeing the implementation of significant automation technology, including a state-of-the-art material handling system for

distribution operations and similar to what is used by major retailers and distributors in retail and consumer goods industries.

• Developed financial and accounting expertise through executive roles, including debt restructuring and refinancings, and previously was determined by our Board to be an audit committee financial expert during her service on our Audit and Risk Committee.

• Is a member of GOJO's sustainable value steering team that drives its strategy.

• Is a member of GOJO's Audit and Risk, People and Culture, and Finance committees.

• Private board service and advisory roles provide additional governance, compensation and strategic oversight experience.

(Emphasis in original).

**Defendant Kobayashi**

35. Defendant Kobayashi has served as a Company director since June 26, 2025. Defendant Kobayashi currently serves as a member of the Audit and Risk Committee.

36. The current report on Form 8-K the Company filed with the SEC on June 26, 2025 stated the following about Defendant Kobayashi:

Mr. Kobayashi has extensive executive leadership experience in retail technology, supply chain and store operations, including over 20 years in executive roles with Ross Stores, Inc. (Nasdaq: ROST), a public company discount retailer, where he currently serves as an advisor. During his tenure at Ross Stores, Mr. Kobayashi served as the President and Chief Capability Officer from February 2022 to March 2025; President, Operations and Technology from August 2019 to January 2022; Group Executive Vice President, Supply Chain, Allocation, Merchant Operations and Technology from 2015 to 2019; Executive Vice President, Supply Chain, Inventory Allocation and Chief Information Officer from 2010 to 2014; Group Senior Vice President, Supply Chain and Chief Information Officer from 2008 to 2010; and Senior Vice President and Chief Information Officer from 2004 to 2008. From 1986 to 2004, he served in various roles of increasing responsibility at Accenture plc (NYSE: ACN), including as a Partner from

2000 to 2004. Mr. Kobayashi holds a Bachelor of Science in Managerial Economics from the University of California, Davis.

**Defendant Lindberg**

37. Defendant Lindberg has served as a Company director since January 2006, and as Chairman of the Board since January 2023. Previously, Defendant Lindberg served as the Company's interim President and CEO from October 2024 to February 2025. Moreover, Defendant Lindberg served the Company in various capacities from 1996-2022, including as the Company's CEO from January 2019 to December 2022 and as the Company's Co-CEO from January 2006 to December 2018. Moreover, the 2025 Proxy Statement notes that Defendant Lindberg "has a direct or indirect material interest in entities which receive over 5% of their annual consolidated revenue from the Company[.]"

38. The 2025 Proxy Statement stated the following about Defendant Lindberg, in relevant part:

> [From] October 2024 to February 2025, [Defendant Lindberg] served as Interim President and Chief Executive Officer at Grocery Outlet. [From]1996 to 2022, [Defendant Lindberg] served various positions at Grocery Outlet and its predecessor, including as Chief Executive Officer (Jan. 2019 to Dec. 2022) and Co-Chief Executive Officer (Jan. 2006 to Dec. 2018).
>
> ***Skills and Qualifications Relevant to Service on our Board***
>
> • Possesses significant experience in the retail and consumer packed goods industries, garnered over his 26-year tenure with us, including 17 years as CEO or co-CEO. From 2000 to 2022, active member of the GMA/FMI (Grocery Manufacturers of America/Food Marketers Institute) and a member of CGA board (California Grocers Association 2014-2019).
>
> • Proven executive manager, including long service to Grocery Outlet as a private company and then as a public company following our IPO in June 2019. Eric's 17-year run as co-CEO and CEO was transformative for Grocery Outlet. Under his leadership, Grocery Outlet grew its store base from 123 to 441 stores, or 259%, and revenues from $612.6 million to $3.58 billion, or 484%, and developed a bi-coastal store footprint. He led sharing our vision

and strategy in the IPO and thereafter in developing key stockholder relationships.

• Eric's deep knowledge of our operations, finances, strategies and industry facilitates a strategic vision to set the overall tone and direction of the Company as well as clear leadership through consistency. As our leading executive, he implemented fundamental strategic initiatives that enhanced our differentiated model for buying and selling, and strengthened our relationships with entrepreneurial Independent Operators that run most of our stores, combining to deliver a "WOW!" shopping experience. In his current oversight role, his unique insights on future strategy and initiatives will continue to be invaluable to our Board.

• Exhibited strong growth focus across all macroeconomic cycles, as demonstrated by our pattern of positive comparable store sales growth and healthy gross margin rates. For example, our comparable store sales increased for 19 out of 20 years through fiscal 2022.

• Long-standing role with our Board and management allows him to provide a unique perspective regarding oversight of enterprise risk management, including focusing on the most critical risks and evaluating risk mitigation activities.

• Has alignment with our other stockholders due to his meaningful stock ownership in the Company.

(Emphasis in original).

**Defendant Molloy**

39. Defendant Molloy has served as a Company director since June 26, 2025. Defendant Molloy currently serves as a member of the Audit and Risk Committee.

40. The current report on Form 8-K the Company filed with the SEC on June 26, 2025 stated the following about Defendant Molloy:

Mr. Molloy has extensive leadership experience and over 25 years of experience in financial, accounting, financial reporting, grocery, consumer products, high-growth retail, enterprise risk and global matters, including through numerous executive and director roles for various public companies. Mr. Molloy previously served as the Chief Financial Officer of Sprouts

> Farmers Market, Inc. (Nasdaq: SFM) from September 2021 to December 2023, and prior to that, as Interim Chief Financial Officer from June 2019 to February 2020. He previously served as Chief Financial Officer or in other financial and accounting roles for numerous public and private companies since 1998. Mr. Molloy has 19 years of collective experience serving as a public company board director for six companies, including serving as Chair of the Audit Committee for each board. He currently serves as a board director of Sally Beauty Holdings, Inc. (NYSE: SBH), Pet Valu Holdings Ltd. (TSX: PET.TO), and BRC Inc. (d/b/a Black Rifle Coffee Company) (NYSE: BRCC). Previously, he served as a director for Sprouts Farmers Market, Inc. from 2013-2021, for Torrid Holdings Inc. (NYSE:CURV) from 2018 to 2021, for Party City Holdings Inc. (NYSE:PRTY) from 2014 to 2016 and for Wingstop Inc. (NASDAQ:WING) from 2015 to 2016. Prior to his business career, Mr. Molloy served as a U.S. Navy fighter pilot for 10 years, later retiring from the Naval Reserve with the rank of Commander. He holds Master of Business Administration from the University of Virginia and a Bachelor of Science in Computer Science from the United States Naval Academy.

**<u>Defendant Moody-Byrd</u>**

41. Defendant Moody-Byrd has served as a Company director since January 2021. Defendant Moody-Byrd currently serves as a member of the Nominating and Corporate Governance Committee.

42. The 2025 Proxy Statement stated the following about Defendant Moody-Byrd, in relevant part:

> Since March 2022, [Defendant Moody-Byrd has served as] Vice President, Marketing of LinkedIn Sales Solutions at LinkedIn Corporation, the world's largest social professional network and a division of Microsoft Corporation. [From] November 2018 to February 2022, [Defendant Moody-Byrd served as] Chief Marketing Officer of Noodle.ai, a software company focused on AI innovation in the global supply chain industry. [From] September 2007 to October 2018, [Defendant Moody-Byrd] served various sales and marketing positions at SAP SE, a multinational enterprise software application company, including most recently as Vice President, Head of Web Marketing (Jan. 2018 to Oct. 2018), and Senior Director, Growth Strategies, Digital and Social Channels (May 2017 to Dec. 2017). [From] February 2001 to August 2007, [Defendant Moody-Byrd] served various marketing and corporate

development positions at Palm, a software developer and manufacturer of smartphones for consumers and enterprises. In prior years, she had retail industry roles with divisions of Federated Department Stores and Target Corporation, with Levi, Strauss & Co., as well as retail consultant roles with McKinsey & Company and Walker K. Levy Associates.

* * *

***Skills and Qualifications Relevant to Service on our Board***

• Developed significant marketing and brand management expertise, including in driving brand awareness and demand generation as well as leading technology and data-driven consumer marketing, through more than 35 years in B2B technology marketing and retail/wholesale industry consulting, merchandising and planning.

• Early career focused on retail industry matters, including serving as a retail consultant for national and global brands, as well as a merchandiser, buyer, and brand manager. At Noodle.ai, she drove brand awareness and revenue generation for a high-growth supply chain software company targeting global consumer packaged goods companies.

• Has had recent involvement in strategic planning and other executive management matters at LinkedIn, and operated as a member of the C-suite at Noodle.ai, including quarterly board meeting presentations with the private equity-led board.

• At SAP, she spent five years as the digital marketing lead for the SAP Community Network, an online loyalty community of over two million customers undertaking various stages of large-scale digital transformations through SAP software implementations, thereby developing familiarity with various stages of the customer experience in such projects.

(Emphasis in original).

**<u>Defendant Ragatz</u>**

43. Defendant Ragatz has served as a Company director since October 2014, and as the Company's Lead Independent Director since January 2023. Previously, Defendant Ragatz served as the Chairman of the Board from October 2014 to December 2022.

Defendant Ragatz currently serves as a member of the Compensation Committee and as a member of the Nominating and Corporate Governance Committee.

44. The 2025 Proxy Statement stated the following about Defendant Ragatz, in relevant part:

> Since Sept. 2001, [Defendant Ragatz] served various positions at Hellman & Friedman LLC, a global private equity firm focused on investing in high-quality, growth-oriented business, including as Senior Advisor (since Feb. 2023), Partner (Jan. 2008 to Feb. 2023), and Director/Principal (Sept. 2001 to Dec. 2007). Prior, [Defendant Ragatz] served in various positions at Bain Capital, LP, a global private equity firm, and Bain & Company, a global management consultancy.
>
> * * *
>
> ***Skills and Qualifications Relevant to Service on our Board***
>
> • Developed significant strategic and operations expertise for retail, supply chain and logistics matters through leading H&F's efforts to invest in high-growth global companies in the consumer, retail and industrial sectors, and taking leadership roles on the boards and board committees of the relevant portfolio companies for over 20 years.
>
> • Strong other public company director experience through his board and board committee service at Snap One and LPL Financial, and together with his significant private company director experience, he has a unique expertise in corporate governance. His significant leadership roles on boards outside of our Board include serving as Chairman or Lead Independent Director of six companies (including one public company), Chair of the Compensation Committee of three companies, Chair of the Audit Committee of three companies (including one public company) and Chair of the Nominating and Corporate Governance Committee of one public company. This breadth of experience and expertise leading boards and board committees enables him to provide critical insights in overseeing and partnering with management of high-growth companies.
>
> • Through serving as Chairman or a member of numerous Audit Committees of public and private companies, being a senior leader on H&F's investment team and leading H&F's macro-economic research and forecasting, he has

> significant finance, accounting and financial reporting expertise, including for retail and high-growth companies.
>
> • His knowledge and expertise regarding enterprise risk oversight for high-growth companies was developed through his public and private company board roles, as well as having responsibility for the full lifecycle of the investing process at H&F, including sourcing ideas, negotiating transactions, raising capital, establishing governance procedures, partnering with executives to grow their businesses and ultimately selling the investments.
>
> (Emphasis in original).

**<u>Defendant York</u>**

45. Defendant York has served as a Company director since November 2010. Defendant York currently serves as a member of the Audit and Risk Committee.

46. The 2025 Proxy Statement stated the following about Defendant York, in relevant part:

> Since June 2024, [Defendant York] has served as Chief Executive Officer of Altea Active, a private fitness and wellness company in Canada. [From] June 2020 to January 2025, [Defendant York] served as Special Advisor to Sobeys, Inc., the second largest food retailer in Canada with over 1,500 stores operating across Canada under a variety of names. [From] June 2020 to January 2024, [Defendant York] served as Partner, Farm Boy Stores Inc., a Canadian specialty grocery retailer. [From] Nov. 2009 to June 2020, [Defendant York] served as Co-Chief Executive Officer and President of Farm Boy, Inc. [From] 1989 to 2009, [Defendant York] served in various roles at Giant Tiger Stores Ltd., a Canadian extreme value discount store chain, including as President and Chief Operating Officer (1999 to 2009). [From] 1986 to 1989, [Defendant York] served with Ward Mallette, Chartered Accountants, where he obtained a chartered accountant/CPA designation.
>
> ***Skills and Qualifications Relevant to Service on our Board***
>
> • Developed extensive knowledge of the grocery and food retail industries, as well as extreme value discount retail, throughout his career spanning over 30 years in these areas.
>
> • Experienced in leading rapid growth in store count and sales evidenced by

his accomplishments at both Giant Tiger Stores and Farm Boy.

• Possesses substantial executive management expertise, with particular experience in developing corporate strategy, oversight of supply chain and logistics matters for fresh food deliveries, distribution centers and business operations.

• Financial and accounting expertise through being a Canadian Certified Public Accountant and serving on the audit committees of other boards. He has been determined by our Board to be an audit committee financial expert.

• Canadian public company director roles provides relevant governance, compensation, additional financial and strategic oversight experience.

(Emphasis in original).

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

47. By reason of their positions as officers, directors, and/or fiduciaries of Grocery Outlet and because of their ability to control the business and corporate affairs of Grocery Outlet, the Individual Defendants owed Grocery Outlet and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Grocery Outlet in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Grocery Outlet and its shareholders so as to benefit all shareholders equally.

48. Each director and officer of the Company owes to Grocery Outlet and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

49. The Individual Defendants, because of their positions of control and authority as directors and/or officers of Grocery Outlet, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

50. To discharge their duties, the officers and directors of Grocery Outlet were

required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

51. Each Individual Defendant, by virtue of their position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Grocery Outlet, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also the officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised the Company's Board at all relevant times.

52. As senior executive officers and/or directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on Nasdaq, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information. Further, they had a duty to ensure the Company remained in compliance with all applicable laws.

53. To discharge their duties, the officers and directors of the Company were

required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Grocery Outlet were required to, among other things:

(a) ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, California, and the United States, and pursuant to Grocery Outlet's Code of Business Conduct and Ethics (the "Code of Ethics");

(b) conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c) remain informed as to how Grocery Outlet conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d) establish and maintain systematic and accurate records and reports of the business and internal affairs of Grocery Outlet and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e) maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Grocery Outlet's operations would comply with all applicable laws and Grocery Outlet's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f) exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g) refrain from unduly benefiting themselves and other Company insiders

at the expense of the Company; and

(h) examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

54. Each of the Individual Defendants further owed to Grocery Outlet and its shareholders the duty of loyalty requiring that each favor Grocery Outlet's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

55. At all times relevant hereto, the Individual Defendants were the agents of each other and of Grocery Outlet and were at all times acting within the course and scope of such agency.

56. Because of their advisory, executive, managerial, directorial, and controlling positions with Grocery Outlet, each of the Individual Defendants had access to adverse, nonpublic information about the Company.

57. The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Grocery Outlet.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

58. In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

59. The purpose and effect of the conspiracy, common enterprise, and common course of conduct was, among other things, to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Exchange Act.

60. The Individual Defendants accomplished their conspiracy, common enterprise, and common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of Grocery Outlet was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and common course of conduct complained of herein.

61. Each of the Individual Defendants aided, abetted, and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

62. At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Grocery Outlet and was at all times acting within the course and scope of such agency.

## GROCERY OUTLET'S CODE OF ETHICS

63. Grocery Outlet's Code of Ethics states that it "is intended as an overview of guiding principles of Grocery Outlet Holding Corp. and its subsidiaries[,]" and that

"[i]ntegrity and adherence to the highest ethical standards are critical to the Company's reputation and success." The Code of Ethics also states that it "applies to each of the Company's directors, officers and employees[.]"

64. In the section titled "Business Conduct," the Code of Ethics states the following:

> You should be aware of the ethical practices of each person that you directly oversee or manage. We must maintain an attitude within the Company that unethical actions or the appearance of unethical actions are not acceptable, even though they may seem to be standard business practices in other companies. You must engage in and promote honest and ethical conduct.

65. In the section titled "Conflict of Interest," the Code of Ethics states the following, in relevant part:

> Other than as may be provided in the Other Governing Documents, you are expected to avoid any activity, investment, interest or association that interferes with or is reasonably likely to interfere with the independent exercise of your judgment when it is related to the Company's interests. You have a duty of loyalty to the Company and must therefore avoid any actual or apparent conflict of interest with the Company.
>
> * * *
>
> In short, you cannot be influenced by improper personal considerations that might consciously or unconsciously affect your judgment regarding the best interests of the Company. If you become aware of an actual or apparent conflict of interest, you should discuss it with the appropriate manager and disclose it to the General Counsel.

66. In the section titled "Protection and Proper Use of Assets," the Code of Ethics states the following:

> You should protect the Company's physical and intangible assets and ensure their efficient use. Theft, carelessness and waste have a direct impact on the Company's profitability, proprietary information and reputation. All Company assets should be used for legitimate business purposes of the

Company only.

67. In the section titled "Accuracy of the Company's Records," the Code of Ethics states the following:

> All official records reflecting the performance (financial or otherwise) and conduct of the Company's business must be accurate and complete in all material respects. All those involved in the preparation of such materials should consider the accuracy of the records of critical importance, and should understand that the Company does not maintain, nor does it tolerate, any off-the-books funds or transactions for any purposes unless in accordance with applicable accounting regulations. It is the policy of the Company to fully and fairly disclose the financial condition of the Company in compliance with applicable accounting principles, laws, regulations and rules. All books and records of the Company shall be kept in such a way as to fully and fairly reflect all Company transactions in accordance with generally accepted accounting principles.
>
> As a public company, the Company adheres to the requirements of the U.S. securities laws and The NASDAQ Stock Market LLC. The Company is required by law to file certain reports and make certain disclosures. All Company personnel should take steps to ensure full, fair, accurate, timely and understandable disclosure in all reports and documents filed with the Securities and Exchange Commission (the "SEC") or any other governmental or regulatory agency and in other public communications made by the Company.

68. In the section titled "Retention of Records," the Code of Ethics states the following:

> Our objective is to retain only those records that are necessary for ongoing business operations, or for compliance with legal, tax or other regulatory requirements. Disposal or destruction of Company records and files (including electronic records) should comply with the Company's Record Retention Policy available on the Company's intranet (otherwise referred to as the "Pantry"). In addition, when litigation, tax audit or a government investigation is pending or imminent, relevant records must not knowingly be destroyed until the matter is closed.

69. In the section titled "Insider Trading," the Code of Ethics states the following,

in relevant part:

> Trading in the stock or securities of a company (including any suppliers, partners, vendors or customers or others related to the Company and their respective affiliates and businesses) by a person who is aware of material, non-public information about that company is considered "insider trading." Information is "material" if a reasonable investor would consider such information important in a decision to buy, hold or sell the securities. Information is non-public until it has been broadly disclosed to the marketplace and the marketplace has had time to absorb the information. Examples of adequate disclosure methods include public filings with the SEC and the issuance of broadly distributed press releases.

70. In the section titled "Legal Conduct and Compliance With This Code," the Code of Ethics states the following, in relevant part:

> You shall conduct business on behalf of the Company in full compliance with the laws of the jurisdictions in which the Company may conduct business, both in letter and spirit. Accordingly, the provisions of this Code are not intended as a substitute for any applicable laws and regulations and the scope of this Code's application shall be limited to the extent incompatible with such laws and regulations. If the Company develops a presence or otherwise conducts business in other countries, legal conduct and compliance with this Code may require further adaptations.
>
> You are encouraged to present any question regarding this Code or its application to your manager, the head of Human Resources, the General Counsel or another member of the Legal Department.

71. In the section titled "Modifications and Waivers," the Code of Ethics states the following:

> As a result of the Company's commitment to keep its policies and procedures current, this Code may be modified from time to time. Any amendment, modification or waiver of any provision of this Code for directors or executive officers must be approved by the Board or the Audit and Risk Committee of the Board. Any such amendment, modification or waiver shall be promptly disclosed in accordance with applicable laws, rules and regulations (including stock exchange rules).

72. In violation of the Code of Ethics, the Individual Defendants conducted little, if any, oversight of the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including but not limited to, breaches of fiduciary duty, abuse of control, gross mismanagement, waste of corporate assets, unjust enrichment, and violations of the Exchange Act. Also, in violation of the Code of Ethics, the Individual Defendants failed to maintain the accuracy of Grocery Outlet's records and reports, failed to maintain internal controls, and failed to comply with laws and regulations, conduct business in an honest and ethical manner, and properly report violations of the Code of Ethics.

**GROCERY OUTLET'S AUDIT AND RISK COMMITTEE CHARTER**

73. The Company also maintains an Audit and Risk Committee Charter (the "Audit and Risk Committee Charter"). The Audit and Risk Committee Charter states that the purpose of the Audit and Risk Committee is to:

> Provide assistance to the Board of Directors . . . with respect to its oversight of: (i) [t]he quality and integrity of the Company's financial statements, including the oversight of the Company's accounting and financial reporting processes; (ii) [t]he Company's compliance with legal and regulatory requirements related to financial reporting and internal controls; (iii) [t]he independent registered public accounting firm's retention, fees, qualifications, planned audit procedures, performance, and independence; (iv) [t]he Company's corporate compliance program, including the Company's Code of Business Conduct and Ethics, and investigating or overseeing investigations of possible violations thereunder; (v) [t]he risk management policies and procedures of the Company; and (vi) [t]he performance of the Company's internal audit function.
>
> The Committee's responsibility is one of oversight. The Company's management is responsible for the Company's internal control over financial reporting and disclosure controls and procedures, the preparation and the integrity of the Company's financial statements and related notes, and accounting and financial reporting principles. The independent registered public accounting firm is responsible for auditing those financial statements

> and internal controls in accordance with the standards of the Public Company Accounting Oversight Board (the "PCAOB"). The Committee is not providing any expert or special assurance or certification as to the activities of management or the independent registered public accounting firm.
>
> Prepare the Committee report required by the Securities and Exchange Commission (the "SEC") to be included in the Company's annual proxy statement.

74. In a section titled "Responsibilities and Duties," under the subsection "Documents/Reports Review," the Audit and Risk Committee Charter states that the Audit and Risk Committee will:

> - Review and discuss with management and the independent registered public accounting firm, prior to public dissemination, the Company's annual audited financial statements and quarterly unaudited financial statements and related notes, the reports of the independent registered public accounting firm on the annual audited financial statements and internal control over financial reporting, and the Company's specific disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations" included in the Company's SEC filings.
>
> - Discuss with the independent registered public accounting firm the matters required to be discussed by the applicable auditing standards adopted by the PCAOB and approved by the SEC from time to time.
>
> - Review and discuss with management and, if appropriate, the independent registered public accounting firm the Company's earnings press releases (including non-GAAP financial measures), as well as financial information and earnings guidance provided to stockholders, analysts and rating agencies. The Committee's discussion in this regard may be general in nature (*i.e.*, discussion of the types of information to be disclosed and the type of presentation to be made) and need not take place in advance of each earnings release or each instance in which the Company may provide financial information and earnings guidance.
>
> - Review and discuss with management and the independent registered public accounting firm any significant issues (including any significant deficiencies or material weaknesses) arising as to the adequacy or effectiveness of the Company's internal control over financial reporting and

> disclosure controls and procedures (including management's reports thereon), any actions taken in light of material control deficiencies and the adequacy of disclosures about changes in internal control over financial reporting.

75. In the same section, under the subsection "Financial Reporting Process," the Audit and Risk Committee Charter states that the Audit and Risk Committee will:

> - In consultation with the independent registered public accounting firm, management and the internal auditors, review the integrity of the Company's financial reporting processes. In furtherance thereof, the Committee must obtain and discuss with management and the independent registered public accounting firm reports from management and the independent registered public accounting firm regarding:
>
>   (i) all critical accounting policies and practices to be used by the Company;
>
>   (ii) critical audit matters as determined by the independent registered public accounting firm;
>
>   (iii) analyses prepared by management and/or the independent registered public accounting firm setting forth significant financial reporting issues and judgments made in connection with the preparation of the financial statements, including all alternative treatments of financial information within generally accepted accounting principles related to material items that have been discussed with the Company's management, the ramifications of the use of the alternative disclosures and treatments, and the treatment preferred by the independent registered public accounting firm;
>
>   (iv) major issues regarding accounting principles and financial statement presentations, including any significant changes in the Company's selection or application of accounting principles; and
>
>   (v) any other material written communications between the independent registered public accounting firm and the Company's management such as any management letter or schedule of unadjusted differences.
>
> - Further, periodically discuss with management the quality of the Company's accounting as the consistency of application of the Company's

accounting policies, the clarity, consistency and completeness of the Company's accounting information contained in the financial statements and related disclosures, and items that have a significant impact on the verifiability, neutrality and consistency of the accounting information included in the financial statements.

- Review periodically the effect of regulatory and accounting initiatives, as well as off-balance sheet structures (if any), on the financial statements of the Company.

- Review with the independent registered public accounting firm (i) any audit problems or difficulties encountered by such firm in the course of the review or audit work, including any restrictions on the scope of its activities or on access to requested information, and any significant disagreements with management and (ii) management's responses to such matters. Without excluding other possibilities, the Committee may wish to review with the independent registered public accounting firm (i) any accounting adjustments that were noted or proposed by such firm but were "passed" (as immaterial or otherwise), (ii) any communications between the audit team and the audit firm's national office respecting auditing or accounting issues presented by the engagement and (iii) any "management" or "internal control" letter issued, or proposed to be issued, by the independent registered public accounting firm to the Company.

76. In the same section, under the subsection "Internal Audit," the Audit and Risk Committee Charter states that the Audit and Risk Committee will:

- Review the appointment and replacement (if applicable) of the leader of the internal audit function.

- Review the significant reports to management prepared by the internal audit function and management's responses.

- Review and discuss the responsibilities, annual work plan and planned audit procedures, performance, budget and staffing of the Company's internal SOX audit function with the internal audit function, and, if appropriate, with the independent registered public accounting firm and/or any third party service provider providing internal SOX audit services to the Company. Discuss the annual work plan, planned audit procedures and testing results

privately with internal audit, without management present, including to make inquiries regarding the independence of the SOX testing scope and findings.

77. In the same section, under the subsection "Legal Compliance / General," the Audit and Risk Committee Charter states that the Audit and Risk Committee will:

- Periodically, review and discuss with the Company's counsel any legal matter that could have a significant impact on the Company's financial statements, including any contingent liabilities related to such proceedings, or internal controls.

- Review and discuss with management the Company's corporate compliance program, including its Code of Business Conduct and Ethics and any procedures for monitoring compliance with the program, as well as any material inquiries received from regulators or government agencies.

- Investigate or oversee the investigation undertaken by or on behalf of the Company regarding the possible violations of the Company's corporate compliance program and report the results recommendations to the Board of Directors.

- Review the annual enterprise risk management assessment, which considers strategic, operational, compliance and financial risks across the organization, with management, the leader of the internal audit function, and, as necessary, the independent registered public accounting firm; such review shall include oversight of the framework, quality and effectiveness of the enterprise risk management process, the Company's policies for monitoring, assessment, prioritization and management of risks, and the steps management has taken to monitor and mitigate such risks.

- As part of the Company's enterprise risk management process, the Committee shall oversee certain identified risks relating to financial risks (including liquidity, legal, regulatory and other contingencies), data security, privacy and cybersecurity risks, and other risks identified (but not assigned to the Board of Directors or another committee thereof), in each case that are assigned to a member of senior management and such person's development of a risk mitigation plan that is tracked to completion.

- Set clear hiring policies for employees or former employees of the independent registered public accounting firm. At a minimum, these policies

must provide that any independent registered public accounting firm may not provide audit services to the Company if the chief executive officer, controller, chief financial officer, or chief accounting officer of the Company, or any person serving in an equivalent capacity for the Company, was employed by the independent registered public accounting firm and participated in any capacity in the audit of the Company during the one-year period preceding the date of the initiation of the audit.

- Establish procedures for: (i) the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls, or auditing matters; and (ii) the confidential, anonymous submission by employees of the Company of concerns regarding questionable accounting or auditing matters.

- Oversee, review and periodically update the Company's Code of Business Conduct and Ethics (including review of requests of waivers thereof by executive officers and directors) and oversee the Company's system to monitor compliance with and enforce such Code of Business Conduct and Ethics.

- Oversee the Company's Related Person Transaction Policy and in accordance with such policy, review and, if deemed appropriate, approve any transaction between the Company and a Related Person that would be required to be disclosed pursuant to Item 404(a) of Regulation S-K of the Exchange Act. "Related Person" shall have the meaning given to such term in Item 404(a) of Regulation S-K.

- Review and approve, at least on an annual basis, the decisions by management to enter into derivative transactions on a cleared or non-cleared basis (*e.g.*, the Company's use of the "end-user exception" for certain derivatives), and the policies and processes of the Company related thereto, and oversee the use of such derivatives. Review and recommend to the Board of Directors on matters pertaining to the Company's derivative transactions and hedging strategy.

78. In the same section, under the subsection "Committee Reports," the Audit and Risk Committee Charter states that the Audit and Risk Committee will:

- Based on discussions with the independent registered public accounting firm and management, determine whether to recommend to the Board of

Directors that the audited financial statements be included in the Company's Annual Report on Form 10-K for the last completed fiscal year for filing with the SEC.

- Prepare the Committee report required by the SEC to be included in the Company's annual proxy statement, which shall disclose, among other things, its prior recommendation to the Board of Directors whether the audited financial statements should be included in the Company's Annual Report on Form 10-K for the last completed fiscal year for filing with the SEC.

- Report regularly to the Board of Directors including:

  (i) with respect to any issues that arise with respect to the quality or integrity of the Company's financial statements, the Company's compliance with legal or regulatory requirements impacting the financial statements or internal controls, the qualification, performance and independence of the Company's independent registered public accounting firm or the performance of the internal audit function;

  (ii) periodically following meetings of the Committee; and

  (iii) with respect to such other matters as are relevant to the Committee's discharge of its responsibilities.

- The Committee shall provide such recommendations to the Board of Directors as the Committee may deem appropriate. The reports to the Board of Directors may take the form of an oral report by the Chair or any other member of the Committee designated by the Committee to make such report.

79. In the same section, under the subsection "Other Responsibilities," the Audit and Risk Committee Charter states that the Audit and Risk Committee will:

- Review or support the Board of Director's review, in consultation with the independent registered public accounting firm and the internal audit function, any material cybersecurity incidents and data breaches, the Company's proposed disclosures related thereto and the Company's plans to mitigate cybersecurity risks and respond to data breaches.

- Periodically review with management the financial and risk mitigation aspects of the Company's significant insurance and self-insurance programs.

- Review and discuss with management and the independent registered public accounting firm any SEC comment letter or other regulatory communication regarding the Company's SEC filings and the Company's responses thereto.

- Review and discuss tax strategies and planning activities, and potential tax changes expected to have a material impact on the Company's financial results with management and the independent registered public accounting firm.

80. In violation of the Audit and Risk Committee Charter, the Individual Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, gross mismanagement, abuse of control, waste of corporate assets, and violations of the Exchange Act. Moreover, in violation of the Audit and Risk Committee Charter, the Individual Defendants failed to maintain the accuracy of the Company records and reports, comply with laws and regulations, act in good faith and diligence without misstating, misrepresenting, or omitting material facts, and properly report violations of the Audit and Risk Committee Charter.

## INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

81. Grocery Outlet is a California-based Delaware corporation whose business operations surround the consumable and produce industries. As noted above, the Company markets a variety of name-brand products through its network of independently owned stores. These stores are run by entrepreneurial independent operators ("IOs"), and purport to attract customers through a combination of deals and everyday staple products.

82. According to the Company, IOs provide initial capital contributions to create new store locations, and as such share approximately half of the store-level gross profits with the Company. Moreover, IOs are thus responsible for the operations of their particular

store locations, such as ordering, merchandising, and managing inventory. Moreover, IOs are responsible for local marketing efforts as well as the hiring, training, and employment of their store's workers.

83. The Company's purchase model allows its stores to offer products at 40% to 70% below competing produce retailers. This is accomplished through the Company's centralized purchasing team coupled with its long-standing relationships with suppliers. According to the Form 10-K the Company filed on January 3, 2026, the Company's suppliers continually source products with positive trends in consumer preference, notably "Natural, Organic, Specialty or Healthy" products. The Company asserts that the ever-changing nature of the products offered at its stores is a driving force behind customer excitement and purchases.

84. As of January 3, 2026, the Company possessed 570 stores in the following states: Alabama, California, Delaware, Georgia, Idaho, Kentucky, Maryland, Nevada, New Jersey, North Carolina, Ohio, Oregon, Pennsylvania, Tennessee, Virginia, and Washington.

85. In the fourth quarter of the 2024 Fiscal Year, the Company initiated the Restructuring Plan, which was substantially completed by the end of the second quarter of the 2025 Fiscal Year. The Company's stated purpose for pursuing the Restructuring Plan was to streamline its new store growth, lower costs, and increase profitability in the long-term. More specifically, the Restructuring Plan encompassed: (1) the discontinued development of certain Company locations; (2) the termination of 28 leases for unopened stores; (3) the termination of certain Company warehouse projects; and (4) a reduction in Company headcount. As of January 3, 2026, the Company recorded $61.8 million in costs as a result of the Restructuring Plan.

86. On March 2, 2026, the Board adopted a subsequent business optimization plan (the "Optimization Plan"). The Company's stated purpose for the Optimization Plan was to further its efforts to reinforce its long-term financial prospects. The Optimization Plan

provides for, *inter alia*: (1) the closure of 36 financially underperforming stores; (2) the termination or sublease of applicable store locations; (3) the termination or sublease of a distribution center facility no longer in use; and (4) the termination of the Company's operating agreements with applicable IOs. The Company has noted its expectation that the Optimization Plan is expected to be substantially completed during the 2026 Fiscal Year.

**<u>False and Misleading Statements</u>**

***August 5, 2025 Press Release***

87. The Relevant Period began on August 5, 2025, when the Company issued the Q2 FY 2025 Press Release.

88. The Q2 FY 2025 Press Release reported, *inter alia*, that "[n]et sales increased 4.5% to $1.18 billion during the second quarter," which was allegedly due, in substantial part, to the addition of "***new store sales***," namely the commencement of "11 new stores" in the second quarter of the 2025 Fiscal Year. Moreover, the Q2 FY 2025 Press Release discussed the Restructuring Plan and noted that the plan purported to, *inter alia*, "optimize the footprint of new store growth and lower the cost base" was "substantially completed in the second quarter of fiscal 2025."

89. The Q2 FY 2025 Press Release also noted that the Company reaffirmed its full year guidance for the 2025 Fiscal Year, apart from the earnings per share metric which was increased. More specifically, the Q2 FY 2025 Press Release stated the following, in relevant part:

> **Highlights for Second Quarter Fiscal 2025 as compared to Second Quarter Fiscal 2024:**
>
> • Net sales increased by 4.5% to $1.18 billion.
> • Comparable store sales increased by 1.1%.
> • Gross margin was 30.6% compared to 30.9% last year.
> • SG&A increased by 4.2% to $336.8 million.
> • Operating income was $12.8 million, which included $11.2 million in restructuring charges.

• Net income was $5.0 million, or $0.05 per diluted share, compared to net income of $14.0 million, or $0.14 per diluted share last year. Adjusted net income was $22.8 million, or $0.23 diluted adjusted earnings per share, compared to $25.1 million, or $0.25 diluted adjusted earnings per share last year.
• Adjusted EBITDA was $67.7 million, representing 5.7% of net sales.

* * *

**Second Quarter Fiscal 2025 Financial Summary**

Net sales increased 4.5% to $1.18 billion during the second quarter due to new store sales and a 1.1% increase in comparable store sales, which was positively impacted by the timing shift of the Easter holiday compared to the prior year. The increase in comparable store sales was driven by a 1.5% increase in the number of transactions, partially offset by a 0.4% decrease in average transaction size. We opened 11 new stores and closed two stores, ending the quarter with 552 stores in 16 states. Starting in the second quarter of fiscal 2025, comparable stores sales include the addition of stores from the acquisition of United Grocery Outlet on April 1, 2024.

* * *

**Restructuring Plan:**

The Company initiated a restructuring plan during the fourth quarter of fiscal 2024, with continuing implementation in fiscal 2025, intended to improve long-term profitability, cash flow generation and return on invested capital, optimize the footprint of new store growth and lower the Company's cost base (the "Restructuring Plan"). The Restructuring Plan includes (i) the termination of a total of 28 leases for unopened stores in suboptimal locations and the discontinued development of certain future store sites where we had incurred initial costs, but leases had not yet been signed, (ii) the cancellation of certain capital-intensive warehouse projects and (iii) a reduction in headcount in building a more scalable cost structure. As of June 28, 2025, the Company estimates that it will incur total costs under the Restructuring Plan of approximately $63 million, of which approximately $39 million is expected to be cash expenditures. All costs incurred during the second quarter and first half of fiscal 2025 are included in Restructuring charges on the condensed consolidated statements of operations and comprehensive income (loss). The

actions under the Restructuring Plan were substantially completed in the second quarter of fiscal 2025.

* * *

**Outlook:**

The Company is maintaining key guidance figures for fiscal 2025, other than diluted adjusted earnings per share which are updated as shown in the current guidance as follows:

| | Previous | Current |
|---|---|---|
| New store openings, net | 33 to 35 | 33 to 35 |
| Net sales | $4.7 billion to $4.8 billion | $4.7 billion to $4.8 billion |
| Comparable store sales increase(3) | 1.0% to 2.0% | 1.0% to 2.0% |
| Gross margin | 30.0%-30.5% | 30.0%-30.5% |
| Adjusted EBITDA(1) | $260 million to $270 million | $260 million to $270 million |
| Diluted adjusted earnings per share(1) | $0.70 to $0.75 | $0.75 to $0.80 |
| Capital expenditures (net of tenant improvement allowances) | $210 million | $210 million |

(Emphases in original).

***August 6, 2025 Form 10-Q***

90. On August 6, 2025, the Company filed its quarterly report on Form 10-Q with the SEC to report its financial and operational results for the second quarter of the 2025 Fiscal Year (the "Q2 FY 2025 10-Q"). The Q2 FY 2025 10-Q was signed by Defendant Miller, and attached to the Q2 FY 2025 10-Q were certifications pursuant to Rules 13a-14(a) and 15(d)-14(a) under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Potter and Miller, certifying that the Q2 FY 2025 10-Q "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report" and that the "information contained in the [Q2 FY 2025 10-Q] fairly present[s] in all material respects the financial condition, results of operations and cash flows of the [Company]."

91. The Q2 FY 2025 10-Q reaffirmed the Company's previously issued financial results and included additional data pertaining to, *inter alia*, new store openings. More

specifically, the Q2 FY 2025 10-Q stated the following, in relevant part:

| | | June 28, 2025 | | December 28, 2024 |
|---|---|---|---|---|
| **Assets** | | | | |
| Current assets: | | | | |
| Cash and cash equivalents | $ | 55,190 | $ | 62,828 |
| Independent operator receivables and current portion of independent operator notes, net of allowance $9,780 and $5,770 | | 16,179 | | 16,051 |
| Other accounts receivable, net of allowance $9 and $9 | | 4,544 | | 4,166 |
| Merchandise inventories | | 398,225 | | 394,152 |
| Prepaid expenses and other current assets | | 27,397 | | 26,701 |
| Total current assets | | 501,535 | | 503,898 |
| Independent operator notes and receivables, net of allowance $13,398 and $12,709 | | 39,603 | | 36,441 |
| Property and equipment, net | | 806,740 | | 750,423 |
| Operating lease right-of-use assets | | 1,105,419 | | 1,014,678 |
| Intangible assets, net | | 80,681 | | 78,778 |
| Goodwill | | 782,835 | | 782,734 |
| Other assets | | 5,563 | | 6,869 |
| Total assets | $ | 3,322,376 | $ | 3,173,821 |

* * *

| | 13 Weeks Ended | | | | 26 Weeks Ended | | | |
|---|---|---|---|---|---|---|---|---|
| | | June 28, 2025 | | June 29, 2024 | | June 28, 2025 | | June 29, 2024 |
| Net sales | $ | 1,179,772 | $ | 1,128,520 | $ | 2,305,339 | $ | 2,165,464 |
| Cost of sales | | 819,079 | | 779,280 | | 1,602,201 | | 1,512,279 |
| Gross profit | | 360,693 | | 349,240 | | 703,138 | | 653,185 |
| Selling, general and administrative expenses | | 336,764 | | 323,135 | | 667,842 | | 626,517 |
| Restructuring charges | | 11,157 | | — | | 45,032 | | — |
| Operating income (loss) | | 12,772 | | 26,105 | | (9,736) | | 26,668 |
| Interest expense, net | | 6,544 | | 5,559 | | 13,064 | | 8,735 |
| Income (loss) before income taxes | | 6,228 | | 20,546 | | (22,800) | | 17,933 |
| Income tax expense (benefit) | | 1,267 | | 6,545 | | (4,444) | | 4,957 |
| Net income (loss) and comprehensive income (loss) | $ | 4,961 | $ | 14,001 | $ | (18,356) | $ | 12,976 |
| Basic earnings (net loss) per share | $ | 0.05 | $ | 0.14 | $ | (0.19) | $ | 0.13 |
| Diluted earnings (net loss) per share | $ | 0.05 | $ | 0.14 | $ | (0.19) | $ | 0.13 |
| Weighted-average shares outstanding: | | | | | | | | |
| Basic | | 98,081 | | 99,542 | | 97,801 | | 99,531 |
| Diluted | | 98,460 | | 100,369 | | 97,801 | | 100,753 |

* * *

| | 13 Weeks Ended | | | | 26 Weeks Ended | | | |
|---|---|---|---|---|---|---|---|---|
| | | June 28, 2025 | | June 29, 2024 | | June 28, 2025 | | June 29, 2024 |
| **Other Financial and Operations Data** | | | | | | | | |
| Number of new stores [(1)] | | 11 | | 51 | | 22 | | 57 |
| Number of stores open at end of period | | 552 | | 524 | | 552 | | 524 |
| Comparable store sales increase [(2)] | | 1.1 % | | 2.9 % | | 0.7 % | | 3.4 % |
| EBITDA [(3)] | $ | 44,106 | $ | 52,650 | $ | 51,495 | $ | 78,102 |
| Adjusted EBITDA [(3)] | $ | 67,747 | $ | 67,878 | $ | 119,632 | $ | 107,273 |
| Adjusted net income [(3)] | $ | 22,766 | $ | 25,095 | $ | 35,773 | $ | 33,904 |

* * *

> ***New Store Growth.*** Planned construction and opening of new stores has been, and may continue to be, negatively impacted due to both increased lead times to acquire materials, obtain permits and licenses, hook up utilities as well as higher construction and development related costs. Recently implemented and proposed tariffs could further impact our constructions costs.
>
> Our new store growth efforts are focused on organic growth combined with complementary real estate opportunities that align with our long-term geographic expansion and store growth strategies. Complementary growth opportunities may include expanding strategic relationships with large property owners, evaluating acquisitions of opportunistic real estate that become available through consolidation in the retail sector, and exploring strategic regional acquisitions of operating businesses. On April 1, 2024, we acquired The Bargain Barn, Inc., a Tennessee corporation doing business as United Grocery Outlet ("United Grocery Outlet"), which included 40 stores in six adjacent states we did not operate in as of such date (Tennessee, North Carolina, Georgia, Alabama, Kentucky and Virginia) and a company-operated distribution center. The acquisition provides us with the opportunity to scale in a new region and is a platform for potential future expansion in the Southeast. Our near-term integration focus is expanding the assortment, investing in store refreshes and new fixtures and introducing some of our marketing programs to the Southeast region. We opened 22 stores and closed 3 stores in the first half of fiscal 2025 and plan to open 33 to 35 net new stores in fiscal 2025.

(Emphasis in original).

***November 4, 2025 Press Release***

92. On November 4, 2025, the Company issued a press release to announce its financial results for the third quarter of the 2025 Fiscal Year (the "Q3 FY 2025 Press Release").

93. The Q3 FY 2025 Press Release reported that the Company's "[n]et sales increased by 5.4% to $1.17 billion" which was allegedly due, in substantial part, to the addition of "***new store sales***," namely the commencement of "13 new stores" in the third quarter of the 2025 Fiscal Year. Moreover, the Q3 FY 2025 Press Release discussed the Restructuring Plan and noted that the plan purported to, *inter alia*, "optimize the footprint

of new store growth and lower the cost base" was "substantially completed in the second quarter of fiscal 2025."

94. The Q3 FY 2025 Press Release also included the Company's revised guidance for the 2025 Fiscal Year, stating the following, in relevant part:

> **Highlights for Third Quarter Fiscal 2025 as compared to Third Quarter Fiscal 2024:**
>
> •Net sales increased by 5.4% to $1.17 billion.
> •Comparable store sales increased by 1.2%.
> •Gross margin was 30.4% compared to 31.1% last year.
> •SG&A increased by 8.7% to $331.0 million.
> •Operating income was $22.8 million, which included $1.3 million in restructuring charges.
> •Net income was $11.6 million, or $0.12 per diluted share, compared to $24.2 million, or $0.24 per diluted share last year. Adjusted net income was $20.7 million, or $0.21 diluted adjusted earnings per share, compared to $27.9 million, or $0.28 diluted adjusted earnings per share last year.
> •Adjusted EBITDA was $66.7 million, representing 5.7% of net sales.
>
> * * *
>
> **Third Quarter Fiscal 2025 Financial Summary**
>
> Net sales increased 5.4% versus last year to $1.17 billion due to new store sales and a 1.2% increase in comparable store sales. The increase in comparable store sales was driven by a 1.8% increase in the number of transactions, partially offset by a 0.6% decrease in average transaction size. We opened 13 new stores and closed two stores, ending the quarter with 563 stores in 16 states.
>
> * * *
>
> **Restructuring Plan:**
>
> As previously reported, the Company initiated a restructuring plan during the fourth quarter of fiscal 2024, with continued implementation in fiscal 2025, intended to improve long-term profitability, cash flow generation and return on invested capital, optimize the footprint of new store growth and lower the

Company's cost base (the "Restructuring Plan"). The Restructuring Plan included (i) the termination of a total of 28 leases for unopened stores in suboptimal locations and the discontinued development of certain future store sites where we had incurred initial costs, but leases had not yet been signed, (ii) the cancellation of certain capital-intensive warehouse projects and (iii) a reduction in headcount in building a more scalable cost structure. As of September 27, 2025, the Company incurred total costs under the Restructuring Plan of $62 million, of which $38 million were cash expenditures. All costs incurred during the third quarter and first three quarters of fiscal 2025 are included in Restructuring charges on the condensed consolidated statements of operations and comprehensive income (loss). The actions under the Restructuring Plan were substantially completed in the second quarter of fiscal 2025.

**Outlook**:

The Company has revised key guidance figures for fiscal 2025 as shown in the current guidance as follows:

| | Current |
|---|---|
| New store openings, net | 37 |
| Net sales | $4.70 billion to $4.72 billion |
| Comparable store sales increase[3] | 0.6% to 0.9% |
| Gross margin | 30.3%-30.4% |
| Adjusted EBITDA[1] | $258 million to $262 million |
| Diluted adjusted earnings per share[1] | $0.78 to $0.80 |
| Capital expenditures (net of tenant improvement allowances) | $210 million |

(Emphases in original).

***November 5, 2025 Form 10-Q***

95. On November 5, 2025, the Company filed its quarterly report on Form 10-Q with the SEC to report its financial and operational results for the third quarter of the 2025 Fiscal Year (the "Q3 FY 2025 10-Q"). The Q3 FY 2025 10-Q was signed by Defendant Miller, and contained SOX certifications signed by Defendants Potter and Miller certifying that the Q3 FY 2025 10-Q "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report" and that the "information contained in the [Q3 FY 2025 10-Q] fairly

present[s] in all material respects the financial condition, results of operations and cash flows of the [Company]."

96. The Q3 FY 2025 10-Q reaffirmed the Company's previously issued financial results and included additional data pertaining to, *inter alia*, new store openings. More specifically, the Q3 FY 2025 10-Q stated the following, in relevant part:

| | September 27, 2025 | December 28, 2024 |
|---|---|---|
| **Assets** | | |
| Current assets: | | |
| Cash and cash equivalents | $ 52,125 | $ 62,828 |
| Independent operator receivables and current portion of independent operator notes, net of allowance $11,551 and $5,770 | 15,511 | 16,051 |
| Other accounts receivable, net of allowance $9 and $9 | 3,641 | 4,166 |
| Merchandise inventories | 417,846 | 394,152 |
| Prepaid expenses and other current assets | 28,335 | 26,701 |
| Total current assets | 517,458 | 503,898 |
| Independent operator notes and receivables, net of allowance $14,015 and $12,709 | 41,207 | 36,441 |
| Property and equipment, net | 818,130 | 750,423 |
| Operating lease right-of-use assets | 1,123,785 | 1,014,678 |
| Intangible assets, net | 80,098 | 78,778 |
| Goodwill | 782,835 | 782,734 |
| Other assets | 5,125 | 6,869 |
| Total assets | $ 3,368,638 | $ 3,173,821 |

* * *

| | 13 Weeks Ended | | 39 Weeks Ended | |
|---|---|---|---|---|
| | September 27, 2025 | September 28, 2024 | September 27, 2025 | September 28, 2024 |
| Net sales | $ 1,168,153 | $ 1,108,183 | $ 3,473,492 | $ 3,273,647 |
| Cost of sales | 813,017 | 763,311 | 2,415,218 | 2,275,590 |
| Gross profit | 355,136 | 344,872 | 1,058,274 | 998,057 |
| Selling, general and administrative expenses | 331,016 | 304,586 | 998,858 | 931,103 |
| Restructuring charges | 1,296 | — | 46,328 | — |
| Operating income | 22,824 | 40,286 | 13,088 | 66,954 |
| Interest expense, net | 6,705 | 6,439 | 19,769 | 15,174 |
| Income (loss) before income taxes | 16,119 | 33,847 | (6,681) | 51,780 |
| Income tax expense | 4,514 | 9,669 | 70 | 14,626 |
| Net income (loss) and comprehensive income (loss) | $ 11,605 | $ 24,178 | $ (6,751) | $ 37,154 |
| Basic earnings (net loss) per share | $ 0.12 | $ 0.25 | $ (0.07) | $ 0.37 |
| Diluted earnings (net loss) per share | $ 0.12 | $ 0.24 | $ (0.07) | $ 0.37 |
| Weighted-average shares outstanding: | | | | |
| Basic | 98,160 | 98,359 | 97,921 | 99,140 |
| Diluted | 98,705 | 98,933 | 97,921 | 100,146 |

* * *

| | 13 Weeks Ended | | 39 Weeks Ended | |
|---|---|---|---|---|
| | September 27, 2025 | September 28, 2024 | September 27, 2025 | September 28, 2024 |
| **Other Financial and Operations Data** | | | | |
| Number of new stores (1) | 13 | 5 | 35 | 62 |
| Number of stores open at end of period | 563 | 529 | 563 | 529 |
| Comparable store sales increase (2) | 1.2 % | 1.2 % | 0.9 % | 2.6 % |
| EBITDA (3) | $ 56,214 | $ 68,101 | $ 107,709 | $ 146,203 |
| Adjusted EBITDA (3) | $ 66,668 | $ 72,258 | $ 186,300 | $ 179,531 |
| Adjusted net income (3) | $ 20,687 | $ 27,853 | $ 56,460 | $ 61,757 |

* * *

***New Store Growth.*** Planned construction and opening of new stores has been, and may continue to be, negatively impacted due to both increased lead times to acquire materials, obtain permits and licenses, hook up utilities as well as higher construction and development related costs. Recently implemented and proposed tariffs could further impact our constructions costs.

Our new store growth efforts are focused on organic growth combined with complementary real estate opportunities that align with our long-term geographic expansion and store growth strategies. Complementary growth opportunities may include expanding strategic relationships with large property owners, evaluating acquisitions of opportunistic real estate that become available through consolidation in the retail sector, and exploring strategic regional acquisitions of operating businesses. On April 1, 2024, we acquired The Bargain Barn, Inc., a Tennessee corporation doing business as United Grocery Outlet ("United Grocery Outlet"), which included 40 stores in six adjacent states we did not operate in as of such date (Tennessee, North Carolina, Georgia, Alabama, Kentucky and Virginia) and a company-operated distribution center. The acquisition provides us with the opportunity to scale in a new region and is a platform for potential future expansion in the Southeast. Our near-term integration focus is expanding the assortment, investing in store refreshes and new fixtures and introducing some of our marketing programs to the Southeast region. We opened 35 stores and closed 5 stores in the first three quarters of fiscal 2025 and plan to open 37 net new stores in fiscal 2025.

(Emphasis in original).

97. The statements referenced above in ¶¶ 87-96 were materially false and misleading and failed to disclose material facts necessary to make the statements made not

false and misleading. Specifically, the Individual Defendants failed to disclose, *inter alia*, that: (1) the Restructuring Plan would require additional store closures and asset write-downs in order to achieve operational goals; (2) the Company's asserted financial growth was due to its rapid expansion into new stores; (3) the Company's expansion into new stores was unsustainable; (4) as a result of the foregoing, the Company was unable to achieve its previously issued financial guidance; and (5) the Company failed to maintain internal controls. As a result of the foregoing, the Individual Defendants caused the Company's public statements to be materially false and misleading at all relevant times.

## THE TRUTH EMERGES

98. The truth emerged March 4, 2026, after the market closed, when the Company issued the Q4 FY 2025 Press Release.

99. The Q4 FY 2025 Press Release revealed that the Company had failed to attain nearly all of its major financial metrics associated with its guidance for the year. Specifically, the Q4 FY 2025 Press Release reported, *inter alia*: (1) an adjusted EBITDA of $254.3 million (as compared to prior guidance of at least $258 million); (2) net sales of $4.69 billion (as compared to prior guidance of at least $4.70 billion); (3) comparable store sales which increased by 0.5% on a 52-week basis (as compared to prior guidance of 0.6% to 0.9%); and (4) diluted adjusted earnings per share of $0.76 (as compared to prior guidance of at least $0.78).

100. In addition, the Q4 FY 2025 Press Release disclosed that the Company was instituting the Optimization Plan to supplement the Restructuring Plan, and that the Company was "reshaping [its] new store growth strategy" including the "closure of 36 financially underperforming stores." The Q4 FY 2025 Press Release also stated that the Company "determined that the long-lived assets of the Closure Stores were impaired, and recognized $110 million of non-cash charges in Impairment of long-lived assets on the condensed consolidated statements of operations and comprehensive income (loss)."

101. The Q4 FY 2025 Press Release also stated the following with regard to the

Company's restructuring costs, in relevant part:

> [The Company estimates] between $14 million and $25 million in net total restructuring charges in fiscal 2026, including between $51 million and $63 million of estimated cash expenditures primarily for lease termination fees, and between $11 million and $14 million of bad debt expense, partially offset by net non-cash write-off of right-of-use assets and lease liabilities associated with these leases of between $(48) million and $(52) million.

102. More specifically, the Q4 FY 2025 Press Release provided the following financial details, in relevant part:

> **Highlights for Fourth Quarter Fiscal 2025 as compared to Fourth Quarter Fiscal 2024:**
>
> •Net sales increased by 10.7% to $1.22 billion, which includes $82.4 million from the 53rd week.
> •Comparable store sales declined by 0.8% on a 13-week basis.
> •Gross margin was 29.7% compared to 29.5% last year.
> •Operating loss was $234.8 million, which included $110.2 million in non-cash impairment of long-lived assets and $149.0 million in non-cash goodwill impairment.
> •Net loss was $218.2 million, or $(2.22) per diluted share, compared to net income of $2.3 million, or $0.02 per diluted share last year. Adjusted net income (1) was $18.7 million, or $0.19 diluted adjusted earnings per share (1), compared to $14.5 million, or $0.15 diluted adjusted earnings per share (1) last year.
> •Adjusted EBITDA (1) was $68.0 million, representing 5.6% of net sales.
>
> **Highlights for Fiscal 2025 as compared to Fiscal 2024:**
>
> •Net sales increased by 7.3% to $4.69 billion.
> •Comparable store sales increased by 0.5% on a 52-week basis.
> •Gross margin was 30.3% compared to 30.2% last year.
> •Operating loss was $221.7 million, which included $113.8 million in non-cash impairment of long-lived assets, $45.9 million in restructuring charges and $149.0 million in non-cash goodwill impairment.
> •Net loss was $224.9 million, or $(2.30) per diluted share, compared to net income of $39.5 million, or $0.40 per diluted share last year. Adjusted net income (1) was $75.2 million, or $0.76 diluted adjusted earnings per share (1),

compared to $76.3 million, or $0.77 diluted adjusted earnings per share (1) last year.

•Adjusted EBITDA (1) increased by 7.4% to $254.3 million, representing 5.4% of net sales.

103. The Q4 FY 2025 Press Release also quoted Defendant Potter as stating the following:

> We made progress on our strategic priorities in 2025; however, our fourth-quarter results made clear that we have more work to do, and we're moving quickly . . . Consumer pressure intensified, federally funded benefits were delayed, and competition grew more promotional in the fourth quarter. In response, we have begun to sharpen our focus on what matters most: delivering clearer value and a better in-store experience. We're intensely focused on restoring the opportunistic mix to rebuild value perception with the customer and advancing our store refresh program, and we're already seeing early, measurable improvements. At the same time, we're closing underperforming stores, reshaping our new store growth strategy and reallocating resources to strengthen operating results and returns on capital. We are confident that we have identified the core challenges, and now have the right plans in place and the right team to execute them.

104. Moreover, the Q4 FY 2025 Press Release stated the following with regard to the Company's Restructuring Plan and Optimization Plan:

> **Optimization Plan and Restructuring Plan:**
>
> To strengthen long-term profitability and cash flow generation, improve operational execution, optimize our existing store footprint and align with our disciplined new store growth strategy, in the first quarter of fiscal 2026 we conducted a strategic, financial and operational analysis of our store fleet. Following that review, on March 2, 2026, our Board of Directors adopted the Optimization Plan that provides for the closure of 36 financially underperforming stores, including the termination or sublease of the applicable store leases, the termination or sublease of a lease for a distribution center facility that we are no longer utilizing, and the termination of operator agreements with independent operators ("IOs") for the applicable store locations as well as certain other store locations. These actions under the Optimization Plan are expected to be substantially completed during fiscal 2026.

> In addition, preceding the adoption of the Optimization Plan, during the reporting process for the audited consolidated financial statements for fiscal 2025, we determined that the long-lived assets of the Closure Stores were impaired, and recognized $110 million of non-cash charges in Impairment of long-lived assets on the condensed consolidated statements of operations and comprehensive income (loss).
>
> In connection with the Optimization Plan, we currently estimate we will incur between $14 million and $25 million in net total restructuring charges in fiscal 2026, including between $51 million and $63 million of estimated cash expenditures primarily for lease termination fees, and between $11 million and $14 million of bad debt expense, partially offset by net non-cash write-off of right-of-use assets and lease liabilities associated with these leases of between $(48) million and $(52) million.
>
> In addition to the above costs, we estimate that our fiscal 2026 gross profit may be negatively impacted by between $4 million and $6 million as a result of sales discounts or product markdowns to liquidate on-hand inventory during the winddown of operations of the Closure Stores.
>
> As previously reported, the Company initiated a restructuring plan during the fourth quarter of fiscal 2024, which was substantially completed in the second quarter of fiscal 2025, intended to improve long-term profitability, cash flow generation and return on invested capital, optimize the footprint of new store growth and lower the Company's cost base (the "Restructuring Plan"). As of January 3, 2026, the Company incurred total costs under the Restructuring Plan of $61.8 million, including (i) $15.9 million of non-cash impairment of long-lived assets in fiscal 2024, and (ii) $38.2 million of cash expenditures and $7.7 million of non-cash impairment and disposal of long-lived assets in fiscal 2025. All costs incurred under the Restructuring Plan are included in Restructuring charges on the condensed consolidated statements of operations and comprehensive income (loss).
>
> (Emphases in original).

105. That same day, the Company hosted the Q4 FY 2025 Earnings Call. During the Q4 FY 2025 Earnings Call, Defendant Potter stated that the Company had "made the difficult decision to close 36 locations" and explained that "it's clear now that we expanded

too quickly, and these closures are a direct correction."

106. More specifically, during the Q4 FY 2025 Earnings Call, Defendant Potter stated the following, in relevant part:

> Following a rigorous analysis of the fleet, we identified 36 stores in the network that we concluded did not have a viable path to sustained profitability regardless of the operational support we could provide. We've made the difficult decision to close 36 locations, 24 of which are located in the East, representing roughly 30% of that region's fleet. We are not fully exiting any state, and we believe we have a meaningful opportunity to grow in the East over the long term. However, it's clear now that we expanded too quickly, and these closures are a direct correction.

107. On this news, the price per share of the Company's common stock fell $2.45, or approximately 27.9%, from a closing price of approximately $8.79 per share at the close of trading on March 4, 2026 to close at $6.34 per share on March 5, 2026.

## DAMAGES TO GROCERY OUTLET

108. As a direct and proximate result of the Individual Defendants' conduct, Grocery Outlet has lost and will continue to lose and expend many millions of dollars.

109. Such expenditures include, but are not limited to, legal fees, costs, and any payments for resolution of or to satisfy a judgment associated with the Securities Class Action, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

110. Such expenditures also include, but are not limited to, fees, costs, and any payments for resolution of or to satisfy judgments associated with any other lawsuits filed against the Company or the Individual Defendants based on the misconduct alleged herein, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

111. Such expenditures will also include costs incurred in any internal investigations pertaining to violations of law, costs incurred in defending any investigations or legal actions taken against the Company due to its violations of law, and payments of any fines or settlement amounts associated with the Company's violations.

112. Additionally, these expenditures include, but are not limited to, unjust compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company.

113. As a direct and proximate result of the Individual Defendants' conduct, Grocery Outlet has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations.

**DERIVATIVE ALLEGATIONS**

114. Plaintiff brings this action derivatively and for the benefit of Grocery Outlet to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Grocery Outlet, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act.

115. Grocery Outlet is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

116. Plaintiff is, and has been at all relevant times, a shareholder of Grocery Outlet. Plaintiff will adequately and fairly represent the interests of Grocery Outlet in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

**DEMAND FUTILITY ALLEGATIONS**

117. Plaintiff incorporates by reference and realleges each and every allegation stated above as if fully set forth herein.

118. A pre-suit demand on the Board is futile and, therefore, excused. When this action was filed, Grocery Outlet's Board consisted of the following twelve individuals: Defendants Potter, Bachman, Haben, Jaros, Kobayashi, Lindberg, Molloy, Moody-Byrd, Ragatz, and York (the "Director-Defendants") and non-parties Frances L. Allen and Felicia D. Thornton (with the Director-Defendants, the "Directors"). Plaintiff needs only to allege

demand futility as to six of the twelve Directors that were on the Board at the time this action was filed.

119. Demand is excused as to all of the Director-Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material fact. This renders the Director-Defendants unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

120. In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly caused or permitted Grocery Outlet to issue materially false and misleading statements. Specifically, the Director-Defendants caused Grocery Outlet to issue false and misleading statements which were intended to make Grocery Outlet appear more profitable and attractive to investors. Moreover, the Director-Defendants caused the Company to fail to maintain internal controls. As a result of the foregoing, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

121. Additional reasons that demand on Defendant Potter is futile follow. Defendant Potter has served as the Company's President, CEO, and as a Company director since February 2025. The Company provides Defendant Potter with his principal occupation for which he receives handsome compensation. Thus, as the Company admits, he is not an independent director. As the Company's trusted President, CEO, and director, Defendant Potter conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. In addition, Defendant Potter signed the SOX certifications associated with the materially false and misleading Forms 10-Q filed by the Company during the Relevant Period. Defendant Potter is also named as a defendant in the

Securities Class Action. For these reasons, too, Defendant Potter breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

122. Additional reasons that demand on Defendant Bachman is futile follow. Defendant Bachman has served as a Company director since November 2019. Defendant Bachman currently serves as the Chair of the Audit and Risk Committee and as a member of the Compensation Committee. The Company provides Defendant Bachman with handsome compensation for his role as a director. As a trusted, long-time director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, too, Defendant Bachman breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

123. Additional reasons that demand on Defendant Haben is futile follow. Defendant Haben has served as a Company director since November 2019. Defendant Haben currently serves as the Chair of the Nominating and Corporate Governance Committee and as a member of the Compensation Committee. The Company provides Defendant Haben with handsome compensation for her role as a director. As a trusted, long-time director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. For these reasons, too, Defendant Haben breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

124. Additional reasons that demand on Defendant Jaros is futile follow. Defendant Jaros has served as a Company director since September 2020. Defendant Jaros currently

serves as the Chair of the Compensation Committee. The Company provides Defendant Jaros with handsome compensation for her role as a director. As a trusted, long-time director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. For these reasons, too, Defendant Jaros breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

125. Additional reasons that demand on Defendant Kobayashi is futile follow. Defendant Kobayashi has served as a Company director since June 26, 2025. Defendant Kobayashi currently serves as a member of the Audit and Risk Committee. The Company provides Defendant Kobayashi with handsome compensation for his role as a director. As a trusted director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, too, Defendant Kobayashi breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

126. Additional reasons that demand on Defendant Lindberg is futile follow. Defendant Lindberg has served as a Company director since January 2006, and as Chairman of the Board since January 2023. Previously, Defendant Lindberg served as the Company's interim President and CEO from October 2024 to February 2025. Moreover, Defendant Lindberg served the Company in various capacities from 1996-2022, including as the Company's CEO from January 2019 to December 2022 and as the Company's Co-CEO from January 2006 to December 2018. Moreover, the 2025 Proxy Statement notes that Defendant Lindberg "has a direct or indirect material interest in entities which receive over 5% of their annual consolidated revenue from the Company[.]" As the former interim

CEO of the Company and the Company's Executive Chairman, the Company provides Defendant Lindberg with his principal occupation for which he receives handsome compensation. Thus, as the Company admits, he is not an independent director. As a trusted, long-time director and as Chairman of the Board, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, too, Defendant Lindberg breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

127. Additional reasons that demand on Defendant Molloy is futile follow. Defendant Molloy has served as a Company director since June 26, 2025. Defendant Molloy currently serves as a member of the Audit and Risk Committee. The Company provides Defendant Molloy with handsome compensation for his role as a director. As a trusted director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, too, Defendant Molloy breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

128. Additional reasons that demand on Defendant Moody-Byrd is futile follow. Defendant Moody-Byrd has served as a Company director since January 2021. Defendant Moody-Byrd currently serves as a member of the Nominating and Corporate Governance Committee. The Company provides Defendant Moody-Byrd with handsome compensation for her role as a director. As a trusted, long-time director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement

in the scheme, and consciously disregarded her duties to protect corporate assets. For these reasons, too, Defendant Moody-Byrd breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

129. Additional reasons that demand on Defendant Ragatz is futile follow. Defendant Ragatz has served as a Company director since October 2014, and as the Company's Lead Independent Director since January 2023. Previously, Defendant Ragatz served as the Chairman of the Board from October 2014 to December 2022. Defendant Ragatz currently serves as a member of the Compensation Committee and as a member of the Nominating and Corporate Governance Committee. The Company provides Defendant Ragatz with handsome compensation for his role as a director. As a trusted, long-time director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, too, Defendant Ragatz breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

130. Additional reasons that demand on Defendant York is futile follow. Defendant York has served as a Company director since November 2010. Defendant York currently serves as a member of the Audit and Risk Committee. The Company provides Defendant York with handsome compensation for his role as a director. As a trusted, long-time director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, too, Defendant York breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

131. Additional reasons that demand on the Board is futile follow.

132. Defendants Bachman (as Chair), Kobayashi, Molloy, and York served as members of the Audit and Risk Committee at all relevant times (collectively, the "Audit and Risk Committee Defendants"). As such, they were responsible for the effectiveness of the Company's internal controls, the truth and accuracy of the Company's financial statements, and the Company's compliance with applicable laws and regulations. During the Relevant Period, they violated the Audit and Risk Committee Charter by engaging in or permitting the Company to engage in the dissemination of materially false and misleading statements to the public and to facilitate the Individual Defendants' violations of law, including breaches of fiduciary duty and violations of the Exchange Act; failed to adequately exercise their risk management and risk assessment functions; and failed to ensure adequate Board oversight of the Company's internal control over financial reporting, disclosure controls and procedures, and the Code of Ethics. Thus, the Audit and Risk Committee Defendants breached their fiduciary duties, are not independent or disinterested, and thus demand is excused as to them.

133. In violation of the Code of Ethics, the Director-Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to cause the Company to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act. In further violation of the Code of Ethics, the Director-Defendants failed to comply with laws and regulations, maintain the accuracy of Company records and reports, avoid conflicts of interest, conduct business in an honest and ethical manner, and properly report violations of the Code of Ethics. Thus, the Director-Defendants face a substantial likelihood of liability, and demand is futile as to them.

134. Grocery Outlet has been and will continue to be exposed to significant losses

due to the wrongdoing complained of herein, yet the Director-Defendants have not filed any lawsuits against themselves or any others who were responsible for that wrongful conduct to attempt to recover for Grocery Outlet any part of the damages Grocery Outlet suffered and will continue to suffer thereby. Thus, any demand upon the Director-Defendants would be futile.

135. The Director-Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Director-Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

136. The acts complained of herein constitute violations of fiduciary duties owed by Grocery Outlet's officers and directors, and these acts are incapable of ratification.

137. The Director-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Grocery Outlet. If there is a directors' and officers' liability insurance policy covering the Director-Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director-Defendants, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Director-Defendants were to sue themselves or certain of the officers of Grocery Outlet, there would be no directors' and officers' insurance protection. Accordingly, the Director-Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is

brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director-Defendants is futile and, therefore, excused.

138. If there is no directors' and officers' liability insurance, then the Director-Defendants will not cause Grocery Outlet to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

139. Thus, for all of the reasons set forth above, all of the Director-Defendants, and, if not all of them, at least six of the Directors, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

**FIRST CLAIM**

**Against the Individual Defendants for Breach of Fiduciary Duties**

140. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

141. Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Grocery Outlet's business and affairs.

142. Each of the Individual Defendants violated and breached their fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

143. The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Grocery Outlet.

144. Also in breach of their fiduciary duties owed to Grocery Outlet, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements and/or omissions of material fact that failed to disclose, *inter alia*, that: (1) the Restructuring Plan would require additional store closures and asset write-

downs in order to achieve operational goals; (2) the Company's asserted financial growth was due to its rapid expansion into new stores; (3) the Company's expansion into new stores was unsustainable; (4) as a result of the foregoing, the Company was unable to achieve its previously issued financial guidance; and (5) the Company failed to maintain internal controls. As a result of the foregoing, the Individual Defendants caused the Company's public statements to be materially false and misleading at all relevant times.

145. In further breach of their fiduciary duties, the Individual Defendants failed to correct and/or caused the Company to fail to correct the false and misleading statements and/or omissions of material fact referenced herein, which renders them personally liable to the Company for breaching their fiduciary duties.

146. Also, in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain internal controls.

147. The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements and representations. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Grocery Outlet's securities.

148. The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper

conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Grocery Outlet's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the scheme alleged herein and to prevent it from continuing to occur.

149. These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

150. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Grocery Outlet has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

151. Plaintiff, on behalf of Grocery Outlet, has no adequate remedy at law.

**SECOND CLAIM**

**Against the Individual Defendants for Unjust Enrichment**

152. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

153. By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Grocery Outlet.

154. The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from Grocery Outlet that was tied to the performance or artificially inflated valuation of Grocery Outlet, or received compensation or other payments that were unjust in light of the Individual Defendants' bad faith conduct. This includes lavish compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company.

155. Plaintiff, as a shareholder and a representative of Grocery Outlet, seeks

restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, the redemption of preferred stock, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

156. Plaintiff, on behalf of Grocery Outlet, has no adequate remedy at law.

**THIRD CLAIM**
**Against the Individual Defendants for Abuse of Control**

157. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

158. The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Grocery Outlet, for which they are legally responsible.

159. As a direct and proximate result of the Individual Defendants' abuse of control, Grocery Outlet has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

160. Plaintiff, on behalf of Grocery Outlet, has no adequate remedy at law.

**FOURTH CLAIM**
**Against the Individual Defendants for Gross Mismanagement**

161. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

162. By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Grocery Outlet in a manner consistent with the operations of a publicly held corporation.

163. As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Grocery Outlet has sustained and will continue to sustain significant damages.

164. As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

165. Plaintiff, on behalf of Grocery Outlet, has no adequate remedy at law.

## FIFTH CLAIM
## Against Individual Defendants for Waste of Corporate Assets

166. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

167. The Individual Defendants caused the Company to pay the Individual Defendants excessive salaries and fees, to the detriment of the shareholders and the Company.

168. As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants have caused Grocery Outlet to waste valuable corporate assets, to incur many millions of dollars of legal liability and/or costs to defend unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

169. As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

170. Plaintiff, on behalf of Grocery Outlet, has no adequate remedy at law.

## SIXTH CLAIM
## Against Defendants Potter and Miller for Contribution Under Sections 10(b) and 21D of the Exchange Act

171. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

172. Grocery Outlet and Defendants Potter and Miller are named as defendants in the Securities Class Action, which asserts claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class

Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendant Potter's, and Defendant Miller's willful and/or reckless violations of their obligations as officers and/or directors of the Company.

173. Defendants Potter and Miller, because of their positions of control and authority as officers and/or directors of the Company, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of the Company, including the wrongful acts complained of herein and in the Securities Class Action.

174. Accordingly, Defendants Potter and Miller are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

175. As such, Grocery Outlet is entitled to receive all appropriate contribution or indemnification from Defendants Potter and Miller.

## PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a) Declaring that Plaintiff may maintain this action on behalf of Grocery Outlet, and that Plaintiff is an adequate representative of the Company;

(b) Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Grocery Outlet;

(c) Determining and awarding to Grocery Outlet the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d) Directing Grocery Outlet and the Individual Defendants to take all necessary actions to reform and improve Grocery Outlet's corporate governance and internal procedures to comply with applicable laws and to protect Grocery Outlet and its shareholders from a repeat of the damaging events described herein, including, but not

limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws and/or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the board;

2. a provision to permit the shareholders of Grocery Outlet to nominate at least six candidates for election to the Board;

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations;

(e) Awarding Grocery Outlet restitution from Individual Defendants, and each of them;

(f) Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g) Granting such other and further relief as the Court may deem just and proper.

**JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

Dated: April 13, 2026

Respectfully submitted,

**THE BROWN LAW FIRM, P.C.**

/s/Robert C. Moest________________

Robert C. Moest, Of Counsel, SBN 62166
2530 Wilshire Boulevard, Second Floor
Santa Monica, CA 90403
Telephone: (310) 915-6628
Email: rmoest@gmail.com

**THE BROWN LAW FIRM, P.C.**
Timothy Brown
767 Third Avenue, Suite 2501
New York, NY 10017
Telephone: (516) 922-5427
Facsimile: (516) 344-6204
Email: tbrown@thebrownlawfirm.net

*Attorneys for Plaintiff*

# VERIFICATION

I, Eric Marcus, am a plaintiff in the within action. I have reviewed the allegations made in this Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 12th day of April 2026.

Signed by:
Eric Marcus
DB0BCE6885D5481...
Eric Marcus